**POLSINELLI LLP**
NOEL S. COHEN (SBN 219645)
ncohen@polsinelli.com
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
Telephone:   (310) 556-1801
Facsimile:    (310) 556-1802

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MICHAEL J. DOBSON, <br><br> Plaintiff, <br><br> v. <br><br><br> DARREN CRAWFORD, an individual; and CHRISTOPHER WALKER, an individual, <br><br> Defendants. | Case No. 2:22-cv-07372-DMG-PD <br> [*Assigned For All Purposes To Honorable Dolly M. Gee*] <br><br> **DEFENDANTS' RESPONSE MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> [*Filed concurrently with Declaration of Albert S. Watkins; Declaration of Christopher Walker; Declaration of Darren Crawford; Declaration of Michael D. Schwade; Declaration of Michael Prost; Defendants' Evidentiary Objections to Plaintiff's Motion for Preliminary Injunction*] <br><br> Hearing Date: January 13, 2023 <br> Time: 3:00 p.m. <br> Place: Courtroom 8C |

1

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 3

MR. DOBSON'S MISDEEDS .................................................................................. 5

CORRECTING THE RECORD .................................................................................. 6

ARGUMENT ........................................................................................................... 9

    1.     Standards for Issuing Preliminary Injunction ..................................... 9

    2.     There is no immediacy ...................................................................... 10

    3.     Mr. Dobson's allegations of irreparable injury are speculative, inconsistent and inadmissible. ......................................................... 12

    4.     Mr. Dobson is unlikely to succeed on the merits. ............................ 16

    5.     A Preliminary Injunction Against Defendants is Not in the Public Interest ............................................................................................... 21

    6.     The Balance of Equities and Hardships Favors Defendants, Particularly When Viewed on a Sliding Scale Given the Strength of Defendant's Likelihood of Success on the Merits. .......................... 22

    7.     A Receiver Should Not be Appointed. .............................................. 23

CONCLUSION ........................................................................................................ 23

1

87396650.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,

   632 F.3d 1127 (9th Cir. 2011) .......................................................................9, 10

*Beardslee v. Woodford*,

   395 F.3d 1064 (9th Cir. 2005) .................................................................................9

*Cf. Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*,

   739 F.2d 466, 472 (9th Cir. 1984) ........................................................................17

*Cuviello v. City of Vallejo*,

   944 F.3d 816 (9th Cir. 2019) .................................................................................11

*Fantasy, Inc. v. Fogerty*,

   984 F.2d 1524 (9th Cir. 1993) ..............................................................................21

*Flynt Distrib. Co., Inc. v. Harvey*,

   734 F.2d 1389 (9th Cir. 1984) ................................................................................9

*Garcia v. Google, Inc.*,

   786 F.3d 733 (9th Cir. 2015) .................................................................................11

*hiQ Labs, Inc. v. LinkedIn Corp.*,

   31 F.4th 1180 (9th Cir. 2022) ..........................................................................17, 22

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,

   571 F.3d 873 ...........................................................................................................16

*Miller v. Cal. Pac. Med. Ctr.*,

   991 F.2d 536 (9th Cir.1993) ..................................................................................10

*Oakland Trib., Inc. v. Chronicle Pub. Co.*,

   762 F.2d 1374 (9th Cir. 1985) ................................................................................9

*Stormans, Inc. v. Selecky*,

   586 F.3d 1109 (9th Cir. 2009) ..............................................................................10

DEFENDANTS' RESPONSE MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

*Winter v. Natural Resources Defense Counsel, Inc.,*

    555 U.S. 7 (2008)...................................................................................................9, 10

**Other Authorities**

Federal Rules of Civil Procedure Rule 65 .......................................................................9

William W. Schwarzer, et al., California Practice Guide: Federal Civil Procedure

    Before Trial § 13:95 (The Rutter Group 2007)........................................................10

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

## **INTRODUCTION**

Plaintiff claims in his Motion for Preliminary Injunction ("Motion") that he was harmed back in March 2022. Plaintiff then waited nine months before filing this Motion wherein he seeks extraordinary relief, including an injunction and the appointment of a receiver.   Plaintiff offers no explanation for sitting on his hands for nine months.  Plaintiff's delay is inexcusable, and firmly establishes that injunctive relief is entirely unnecessary.  For that reason alone, the Motion should be denied.

The Motion is Plaintiff Michael Dobson's third iteration in this litigation (and fourth overall) of a series of misstatements of fact and revisionist history in support of his ongoing efforts to divert attention from his prior misconduct and mismanagement/non-management of The Better Foundation, LLC ("TBF").

Mr. Dobson's most recent version of events features a new analysis of TBF and UMZU, LLC ("UMZU") financials that Mr. Dobson has gone to some lengths to characterize as indicia of poor recent performance by TBF and/or UMZU. In reality, the only things this new line of attack proves is (1) Mr. Dobson indeed has access to company financial information (which Defendants routinely provide him) and (2) in choosing to publicly disparage the performance of TBF and/or UMZU, Mr. Dobson continues to exhibit a pattern and practice of poor business judgment that has brought the parties to this moment.

The remainder of Mr. Dobson's Motion is a retread of the same erroneous allegations found in the Complaint, TRO application and the filing papers before the Court in connection with Defendants' Joint Motion to Compel Arbitration and Stay Proceedings. Those allegations, while meritless, do merit response.

As with his Reply in Opposition to the Motion to Compel Arbitration, Mr. Dobson continues to play fast and loose with corporate formalities when it suits his interests in this litigation. TBF and UMZU are not interchangeable. TBF is a

DEFENDANTS' RESPONSE MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

holding company for UMZU. TBF has no operations of its own. UMZU is the operating company. It sells nutritional supplements to the consuming public. The day-to-day operations of UMZU have always been controlled by Defendant Christopher Walker. Mr. Walker is the company's CEO. He is indeed a "30 something". Mr. Walker is currently thirty-three years old. *See* Declaration of Christopher Walker ("Walker Decl. 2") at ¶2. Mr. Walker was CEO and managed the day-to-day operations of UMZU during the entire period that was subject to Mr. Engel's financial analysis set forth in the Motion. *Id.* at ¶5. Contrary to the allegations of the Motion, Mr. Walker did have "real business experience" prior to the formation of TBF. The foundation of TBF is intellectual property developed by Mr. Walker and owned by his company Blazing Squid, LLC f/k/a Testshock and later known as TruthNutra. Mr. Walker successfully operated Testshock for two (2) years prior to the formation of TBF. *Id.* at ¶6. Testshock was folded into TBF for nominal consideration to provide TBF/UMZU with turnkey access to a significant database of repeat established customers. *Id.* at ¶7.

Similarly, Darren Crawford is the COO of UMZU. He is not a "30 something". Mr. Crawford is currently forty-eight years old. *See* Declaration of Darren Crawford ("Crawford Decl. 2") at ¶2. Mr. Crawford was the COO and assisted in the management of the day-to-day operations of UMZU during the entire period that was subject to Mr. Engel's financial analysis set forth in the Motion. *Id.* at ¶3. Mr. Crawford has significant prior business experience, including starting his first business in 1997 and several more thereafter, including Kinobody, LLC, which he contributed to TBF to convert a profit sharing agreement with Kinobody into an initial ownership by TBF of a 25% interest in Kinobody to ensure TBF could fund then future projects. Kinobody revenues indeed provided necessary cash flow and financial stability in the early days of TBF. *Id.* at ¶4.

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

Mr. Dobson, for his part, served as the managing member of TBF until Defendants learned of several instances of gross misconduct and impropriety by Mr. Dobson in his self-serving management of TBF. Defendants do not dispute they have restricted Mr. Dobson's access to TBF funds upon their discovery of his misdeeds. Mr. Dobson's actions, as set forth hereinbelow, justify this extraordinary action and Defendants' failure to do so would have been negligent. Indeed, it is Defendants whose actions best preserve the *status quo* for TBF. Exposing TBF's accounts to Mr. Dobson's control is certain to inflict further economic injury on TBF and, by extension, its members.

Finally, time is not on Mr. Dobson's side in this matter. Plaintiff's Motion inaccurately asserts he was "locked out" in March 2022. *See* Motion at p. 9, ln 2-3. June 2022 is the correct month in which TBF implemented measures to obviate risk of exposure to further improprieties by Dobson. Walker Decl. 2, supra, at ¶8. Dobson traveled from California to Denver to meet with Defendants in May 2022 to discuss the dispute between them. Dobson claims Defendants stopped paying him his $25,000 monthly distribution in August 2022. *See* Motion, supra, at p. 9, ln 4 – 5. Dobson traveled from Los Angeles to San Diego in September 2022 to participate in a mediation with Defendants to discuss resolution of the disputes between them. Dobson began defending the pending AAA arbitration brought against him in September 2022. Dobson initiated the instant federal litigation on October 10, 2022 and had his *ex parte* TRO application denied on October 14, 2022 without prejudice to his filing of a motion for preliminary injunction. It was not until December 16, 2022 that Dobson has filed the Motion seeking to "preserve the status quo". Dobson's filing should be seen for what it is: a tardy tantrum. There is no imminent threat of irreparable injury to Mr. Dobson.

## BACKGROUND

This case involves an ongoing shareholder dispute over the management of

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

TBF and its wholly owned affiliate UMZU taking place the past several months. *See* Doc. 13-3 (Declaration of Albert S. Watkins, Esq.) ("Watkins Decl. 1") affixed to Motion to Compel Arbitration and incorporated herein by reference at ¶4. The dispute arises from an investigation by Messrs. Crawford and Walker into the financial books and records of TBF and UMZU and the discovery of irregularities therein. *Id.* at ¶5. Upon learning of the irregularities, Messrs. Crawford and Walker confronted Plaintiff. *Id.* at ¶6.

After confronting Mr. Dobson, the parties agreed to mediate their dispute pursuant to the terms of the TBF Operating Agreement. *Id.* at ¶7. The mediation took place on September 9, 2022. *Id.* at ¶7. The mediation did not result in a settlement. Defendants' counsel met with Plaintiff's prior counsel in a hotel lobby in San Diego on September 8, 2022. *See* Doc. 28-1 ("Watkins Decl. 2") at ¶¶6, 7. Among other topics, Plaintiff's prior counsel expressed to Defendants' counsel that Dobson recognized that he "would have to account" for $1,310,000 in funds drawn down by Dobson from a TBF line of credit and used for non-TBF purposes. *Id.* at ¶8. This topic, among others of similar nature involving not insignificant additional funds, was further discussed during the mediation on September 9, 2022. Dobson, and his prior counsel, "ghosted" the mediation midday, opting not to advise the mediator or Messrs. Walker, Crawford and their counsel of same.

The foregoing notwithstanding, given the allegations of the Opposition, Defendants would be remiss not to inform the Court that (1) Defendants' allegations of irregularities were not "bald assertions"; (2) it is untrue that Defendants "were unable to produce any evidence supporting their claims"; and (3) it is Plaintiff who did not participate in mediation in good faith. Specifically, Defendants' counsel hired an independent third-party accountant to review the accounts and records of TBF. *Id.* at ¶9. The accountant identified accounting irregularities, which he documented in a report that contained comprehensive

relevant schedules. *Id.* at ¶10. Defendants' counsel provided a copy of the report, including its schedules, to Plaintiff's prior counsel on August 1, 2022 and again made same (and the accountant himself) available during the mediation. *Id.* at ¶11. The report, which is preliminary and subject to modification as additional information (under the control of Dobson) is obtained, asserts *inter alia* that "Dobson has taken in excess of at least $3,432,723.84 versus monies that he has put into TBF". *Id.* at ¶12. Obtaining the explanation for the financial irregularities which led to that conclusion was one of the Defendants' objectives in participating in a mediation with Plaintiff on September 9, 2022. *Id.* at ¶13.

Mr. Prost has attested to the authenticity and accuracy of his July 12, 2022 report ("Prost Report"), a redacted copy of which accompanies this response. *See* Declaration of Michael Prost ¶¶1-4.

Upon being confronted with Defendants' allegations at mediation, Plaintiff refused to explain his conduct and abruptly departed without prior notice to either the mediator (Retired Judge Prager) or the Defendants. He and his prior attorney simply left halfway through the day. Watkins Decl. 2, supra, at ¶¶14, 15.

## **MR. DOBSON'S MISDEEDS**

In addition to the misconduct set forth in the Prost Report, which is incorporated by reference herein, Mr. Dobson has been negligent and deceptive in his "management" of TBF. Mr. Dobson's access to TBF bank accounts and company credit cards was indeed restricted by Defendants in June 2022. Walker Decl. 2 at ¶8. These restrictions were put in place by Defendants upon learning of some of the early findings of Mr. Prost and learning Mr. Dobson charged personal expenses for adult entertainment, liquor store purchases, exorbitant restaurant charges (including charges of several thousand dollars at restaurants owned and operated by Mr. Dobson) and family travel. *Id.* at ¶9.

On the eve of the September 2022 mediation, Defendants learned Mr.

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

Dobson was served with a lawsuit against TBF along with Mr. Dobson, personally, and a host of other business entities and restaurants owned by Mr. Dobson arising from Mr. Dobson's entry into a factoring agreement secured by TBF's assets. *Id.* at ¶10. Mr. Dobson never discussed entering into a factoring agreement with Defendants. *Id.* at ¶11. Mr. Dobson entered into the factoring agreement on March 18, 2019 in exchange for the sum of $656,250. *Id.* ¶12. Mr. Dobson did not pay as required. TBF's assets were used to secure the amount paid by the factoring company which put TBF at risk for violating loan covenants with its then existing bank. Dobson was served with the Complaint filed in Queens County, New York case 711518/2020 on or about July 29, 2020 and a Default Judgment was entered against TBF and Mr. Dobson on December 18, 2020 in the amount of $99,490.29. *Id.* at ¶13. Almost two years later, and only after it was clear that Messrs. Walker and Crawford were on to Mr. Dobson's scheme did Mr. Dobson choose to satisfy the Judgment on the eve of mediating this dispute and a Satisfaction of Judgment was filed on August 19, 2022. *Id.* at ¶14.

## **CORRECTING THE RECORD**

Mr. Dobson, in his Motion, has made several inaccurate factual allegations that require correction.

1.     As CEO of UMZU, Mr. Walker has the authority to take executive actions without Mr. Dobson's approval. *Id.* at ¶3. In fact, Mr. Dobson acknowledged as much when he conceded that Mr. Walker is CEO and the day-to-day operator of UMZU. The same is true of Mr. Crawford, who is the COO of UMZU.

2.     Mr. Dobson has never operated or controlled UMZU. *Id.* at ¶4.

3.     Neither TBF nor UMZU has ever received a formal valuation of $150,000,000. *See* Doc. 28-3 ("Walker Decl. 1") at ¶10. This is a figure that was discussed as aspirational during UMZU's discussions with its financial advisor.

6

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

1   There is no formal business appraisal for that amount. Walker Decl. 2 at ¶15.

2        4.    Similarly, there was never a "sale" in the works with regard to either

3   TBF or UMZU. Walker Decl. 1, supra, at ¶30. In fact, Defendant Walker

4   terminated the services of its financial advisor, in part, because no one had

5   expressed any interest in purchasing UMZU and, in larger part, the inability of

6   TBF and its members to truthfully make representations and warranties until after

7   reconciliation of the irregularities giving rise to the present dispute. *Id.*

8        5.    TBF does not have any "products" or "suppliers" and, as such, is not

9   refusing to pay any key vendors or suppliers. *Id.* at ¶11. UMZU is in a strong

10  financial position and has been at all times over the past twelve (12) months. *Id.* at

11  ¶14. UMZU is current with all vendors and suppliers with the exception of

12  MCLLP, a law firm closely aligned with Mr. Dobson. *Id.* at ¶15. MCLLP refuses

13  to provide Walker and Crawford with adequate billing detail or documentation

14  relating to its billing of legal services to UMZU, which were provided for Mr.

15  Dobson, individually, necessitating the company's withholding of the firm's

16  payment until the reason for same is garnered. *Id.* at ¶16.

17       6.    UMZU is current with Lief Organics ("Lief"). The amount due from

18  UMZU to Lief is currently $2,238,680 with UMZU on track to owe less than

19  $1,000,000 by the beginning of 2023. *Id.* at ¶17.

20       7.    There is no personal guaranty, for Mr. Dobson or anyone else,

21  securing the line of credit with Lief as the previously discussed agreement was

22  never finalized or executed. *Id.* at ¶18.

23       8.    Defendants are indeed withholding the customary monthly payments

24  of $25,000 from Mr. Dobson pending resolution of this dispute. However, those

25  funds are being held in a segregated sub-account and will be disbursed as

26  appropriate, upon the resolution of the current dispute. Walker Decl. 2 at ¶16. Mr.

27  Dobson's counsel was informed by Defendants' counsel these funds were being

28

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

segregated and accounted for prior to filing the Motion. *See* Declaration of Michael D. Schwade at ¶4.

9.     Defendants Walker and Crawford have made no attempts to damage TBF or UMZU or seize more ownership interests in TBF. Defendant Walker did propose re-allocating ownership interests in TBF in 2021 into equal shares between them. Walker Decl. 1 at ¶19. Plaintiff rejected the proposal and was demonstrably upset by the proposal. *Id.* at ¶20. Defendants accepted Dobson's response without resentment. *Id.* at ¶21. Defendants are not "obsessed with getting rid of Dobson". *Id.* at ¶22. Defendants did not raise the topic of ownership interests with Dobson again including during a May 2022 meeting in Colorado at the UMZU office with all three parties to this litigation present. *Id.* at ¶23. Should this matter proceed to a hearing, Defendants may offer a complete recording of the May 2022 meeting into evidence in support of this assertion.

10.    Plaintiff's allegations relating to the filings with the California Secretary of State are a red herring. As set forth in their Joint Reply in support of the Motion to Compel Arbitration, Defendants did not intentionally remove Dobson's name from the Statement of Information on file with the California Secretary of State's Office. *See* Doc. 28-4 (Decl. of Darren Crawford) at ¶¶ 3-8.

11.    No one has forced Colleen Dobson out of UMZU. Ms. Dobson resigned her employment voluntarily and Plaintiff Dobson unilaterally negotiated a severance agreement with his sister in connection with same. UMZU has honored the terms of that agreement. Walker Decl. 2, supra, at ¶17.

12.    Mr. Walker's spouse is employed by UMZU. She performs bona fide services for UMZU and is paid a reasonable wage. *Id.* at ¶18.

13.    Neither TBF nor UMZU are paying for Defendants' legal fees incurred in connection with this dispute. It was agreed between all parties to this litigation that UMZU would cover the costs of mediation in San Diego, which it

8

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

did, despite Dobson's premature departure. *Id.* at ¶19.

14.     UMZU has paid a portion of the fees incurred by Wipfli for Mr. Prost's work on behalf of UMZU as part of the tax due diligence process and appearance at mediation that uncovered Mr. Dobson's malfeasance. *Id.* at ¶20.

## ARGUMENT

### 1. Standards for Issuing Preliminary Injunction

Courts must exercise discretion in deciding whether to grant a preliminary injunction in order to prevent immediate and irreparable injury. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Fed. R. Civ. P. 65(b)(1)(A). "[T]he basic function of a preliminary injunction is to preserve the *status quo ante litem* pending a determination of the action on the merits." *Oakland Trib., Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (quoting *L.A. Mem. Coliseum Comm'n v. N.F.L.*, 643 F.2d 1197, 1200 (9th Cir. 1980)). Where there is urgency, the court may give inadmissible evidence some weight, when doing so serves the purpose of preventing irreparable harm before trial. *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).

There are two standards governing the entry of preliminary injunctions pursuant to Rule 65 of the Federal Rules of Civil Procedure in the Ninth Circuit. The first test is the *Winter* factor test, which request a plaintiff to demonstrate (1) plaintiff is likely to succeed on the merits; (2) the balance of equities favors the plaintiff; (3) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; and (4) the preliminary injunction is in the public interest. *Winter v. Natural Resources Defense Counsel, Inc.*, 555 U.S. 7 (2008).

Before *Winter*, courts in the Ninth circuit applied a sliding scale test that allowed the movant to offset the weakness of a showing on one factor with the strength of another. *See Alliance for Wild Rockies,* supra, at 1131; see also *Beardslee v. Woodford*, 395 F.3d 1064, 1067 (9th Cir. 2005). While the Supreme

9

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

1   Court did not directly address the continued validity of the Ninth Circuit's sliding
2   scale approach in *Winter*, the Ninth Circuit has since found that post-*Winter*, the
3   sliding scale approach survives when applied as part of the four-element *Winter*
4   test. *Id.* at 1131-32. The portion of the sliding scale test that allowed injunctive
5   relief upon the possibility, as opposed to likelihood, of irreparable injury, was
6   expressly overruled by *Winter*. See *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127
7   (9th Cir. 2009). In *Winter*, the Supreme Court refuted the Ninth Circuit's
8   "possibility of irreparable injury" standard, stating "the . . . standard is too lenient".
9   *Winter*, supra at 22. The Court instructed that "[i]ssuing a preliminary injunction
10  based only on a possibility of irreparable harm is inconsistent with our
11  characterization of injunctive relief as an extraordinary remedy that may only be
12  awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*.

13          The second test, also known as the "sliding scale" or "serious questions"
14  test, post-*Winter*, requires a plaintiff to demonstrate the following in order to be
15  granted a preliminary injunction: (1) there are "serious questions" going to the
16  merits"; (2) the "balance of hardships that tips sharply toward the plaintiff"; (3) "a
17  likelihood of irreparable injury"; and (4) a preliminary injunction is in the public
18  interest. *Alliance for the Wild Rockies*, supra, at 1135.

19      **2. There is no immediacy.**

20          Unexplained delay in seeking "emergency" injunctive relief undercuts a claim
21  that an injunction is necessary to prevent immediate and irreparable injury.
22  "Plaintiff's long delay before seeking a preliminary injunction implies a lack of
23  urgency and irreparable harm." *Miller v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th
24  Cir.1993)); *see also* William W. Schwarzer, et al., California Practice Guide: Federal
25  Civil Procedure Before Trial § 13:95 (The Rutter Group 2007) ("An important factor
26  will be whether the applicant could have sought relief earlier by a motion for
27  [injunction], avoiding the necessity for a last-minute [temporary restraining
28

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

order].")). "[U]nreasonable delay can defeat irreparable injury and the length of time 'need not be great.'" *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015). It is generally recognized that a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm". *Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019).

Plaintiff comes to this Court seeking a preliminary injunction nine (9) months after he alleges he was locked out of TBF in March 2022. Even when correcting Plaintiff's error to reflect he was actually locked out in June 2022, Plaintiff's delay is inexcusable. Plaintiff's Declaration in support of his request contains a laundry list of concerns, but not a single explanation. Plaintiff owes this Court an explanation for his delay. If there is a reason Mr. Dobson could not seek an injunction sooner, that reason should be provided. Mr. Dobson is represented by competent counsel in this matter. He was represented previously by separate competent counsel from at least July 28, 2022 through the present. *See* Declaration of Albert S. Watkins ("Watkins Decl. 3"), at ¶4.

Mr. Dobson did not seek an injunction in June 2022.

Defendants' counsel issued a detailed letter to Mr. Dobson asserting misconduct by Mr. Dobson on July 27, 2022. Watkins Decl. 3, supra, at ¶5. Mr. Dobson's prior counsel responded to the July 27, 2022 letter by letter dated July 28, 2022. *Id.* at ¶6.

Mr. Dobson did not seek an injunction in July 2022.

Mr. Dobson's counsel was provided the Prost Report on August 1, 2022.

Mr. Dobson did not seek an injunction in August 2022.

The parties participated in mediation on September 9, 2022. The mediation did not result in a settlement. *See* Doc. 13-3 at ¶7, 9.

Mr. Dobson did not seek an injunction in the aftermath of the unsuccessful mediation.

Defendants herein filed their claims against Mr. Dobson with the AAA on September 26, 2022. *Id.* at ¶10.

Mr. Dobson did not seek an injunction in September 2022.

Mr. Dobson sought an *ex parte* temporary restraining order from this Court on October 11, 2022, which the Court denied *sua sponte* by Order dated October 14, 2022. *See* Doc. 10. The Court specifically advised Plaintiff that the Court's Order denying the TRO was without prejudice to Plaintiff's "without prejudice to refiling as a regularly-noticed motion for a preliminary injunction, if appropriate."

Mr. Dobson still did not seek an injunction in October 2022.

Defendants' focus of their November 2022 Reply brief in support of the Motion to Compel Arbitration was to remind Plaintiff that he had not sought injunctive relief in this matter.

Mr. Dobson still did not seek an injunction in November 2022.

It was not until December 16, 2022 that this matter rose to a level of sufficient urgency that Mr. Dobson saw fit to seek a preliminary injunction.  The delay is unexplained. The change in circumstances from the time Mr. Dobson was locked out to December 16, 2022 when he brought the matter before the Court is not discussed. There has been no urgency from Mr. Dobson because this is not an urgent matter. Mr. Dobson's tardiness belies his claim that he is likely to suffer immediate and irreparable injury and the Court should be skeptical of Mr. Dobson's assertions to the contrary.

## 3. Mr. Dobson's allegations of irreparable injury are speculative, inconsistent and inadmissible.

The declaration submitted by Mr. Dobson consists of the imaginative musings of a desperate litigant. Mr. Dobson has been found out and now he is lashing out. A cursory review of Mr. Dobson's Declaration reveals a great deal of hearsay and unsubstantiated assertions, which, at times, are internally inconsistent.

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
87396650.1

1    Notably, Mr. Dobson reveals himself as an unreliable narrator when he asserts

2    "the current balance is approximately $7-8 million" on the line of credit from Lief.

3    *See* Doc. 31-1 at ¶14. Just three pages later, Mr. Dobson testified, "UMZU's largest

4    manufacturer, Lief, is currently owed a balance of approximately $2 million". *Id.* at

5    ¶28. The $5 – 6 million difference between these two statement is significant and

6    casts Mr. Dobson's credibility further into doubt. Of course, one would not have to

7    rely upon Mr. Dobson if he did not support his allegations with hearsay.

8    Mr. Dobson asserts he is a personal guarantor on the Lief line of credit. *Id.* If

9    that were true (which it is not), Mr. Dobson could simply request the correct balance

10   from Lief and request Lief to execute a declaration attesting to the statements Mr.

11   Dobson is attributing to it. Of course, that did not happen because Mr. Dobson's

12   assertions are false. Defendants are more credible on this point and they have

13   testified by declaration that the Lief account is current and will have a balance due

14   of less than $1 million by the start of 2023.

15   Defendants acknowledge the urgency of matters permit a court to rely upon

16   otherwise inadmissible evidence to decide a preliminary injunction. However, the

17   Court should consider why it is being given inadmissible evidence when admissible

18   evidence is readily available to the offering party.

19   Mr. Dobson offers the Court further hearsay when he testifies "[v]endors have

20   been contacting [Plaintiff] about not being paid and threatening to take action against

21   UMZU/TBF" and "[o]ther vendors have been contacting me asking why bills have

22   not been paid." *Id.* at 28. Mr. Dobson does not identify a single vendor who has (a)

23   contacted him; (b) not been paid; and/or (c) threatened to take action against

24   UMZU/TBF. Defendants have testified that they are current with all vendors except

25   MCLLP, a law firm that is aligned with Mr. Dobson and provided legal work for

26   Mr. Dobson for which it is seeking payment from TBF without providing supporting

27   records.

28

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

Mr. Dobson alleges he is the personal guarantor of a $6 million line of credit for TBF, that he "[has]no idea what is going on with the line of credit" and that Defendants could "draw down" that line "at any time, including to pay their personal income taxes". *Id.* at 29. Again, Mr. Dobson, as personal guarantor of a loan could simply contact the lender of a line of credit he personally guarantees and inquire what the balance is and whether payments are current. Mr. Dobson provides this Court with no evidence that Defendants have accessed any line of credit guaranteed by Mr. Dobson. A declaration from a financial institution holding a line would be readily available to Mr. Dobson. Of course, such a declaration would be useless to Mr. Dobson because neither UMZU, TBF or Defendants have accessed any $6 million line of credit guaranteed by Mr. Dobson. Walker Decl. 2, supra, at ¶21. Mr. Dobson further omits from his discussion of the line of credit that he has refused to provide the lender with his personal financial statement despite multiple requests from the lender. Both Defendants have timely provided the lender with their personal financial statements. *Id.* at ¶22.

In the immediately following paragraph, Mr. Dobson testified, "I have also heard that Crawford and Walker may be entering into a factoring deal, which would create many financial issues for TBF." *Id.* at 30. This statement is obviously hearsay and should be disregarded as such. Second, it is untrue. Defendants are not considering entering into any factoring deal. Walker, Decl. 2, supra, at ¶23. As it pertains to UMZU, the allegation is an impossibility, as UMZU does not have receivables. *Id*. Third, this is actually a subliminal confession by Mr. Dobson. As set forth above, Plaintiff, while managing TBF, entered into a factoring deal encumbering TBF receivables that resulted in a default judgment against TBF, which Mr. Dobson subsequently secretly satisfied on the eve of mediation in this case. Defendants agree a factoring deal would create financial issues for TBF, but the party likely to enter into such a deal is Plaintiff, not Defendants.

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

Taking his speculation a step further, Mr. Dobson asserts, "[p]rior to being locked out, I noticed TBF did not have much cash on hand, and now I fear Defendants are pulling money out of TBF to pay for their own income taxes, legal fees, and other improper purposes." Doc. 31-1, supra, at ¶34. Mr. Dobson provides no basis for his "fear" of what Defendants are doing. He simply wants the Court to adopt that fear and act on it. Mr. Dobson's fears are misplaced. Defendants are not misappropriating UMZU funds to pay their personal income taxes, legal fees or any other improper purposes. Walker Decl., supra, at ¶24.

Mr. Dobson's tax paranoia continued when he testified, "TBF must pay 20 tax vouchers for taxes it owes in 42 states and territories" and he "has been unable to ensure that all taxes have been paid". Mr. Dobson states, "[i]f TBF's taxes are not timely paid, [Mr. Dobson] will suffer irreparable harm in the form of penalties, late fees, and even involvement by the Internal Revenue Service." Doc. 31-1, supra, at ¶27. First, Defendants have paid the subject taxes and did so in a timely manner. Walker Decl., supra, at ¶25. Second, Mr. Dobson already knows that because Defendants confirmed same to him by email when he raised this issue in October 2022. *Id.* Third, penalties, late fees and the involvement of the IRS are not irreparable injuries. Those are monetary damages that are adequately remedied by legal relief.

Finally, the biggest whopper of all of Mr. Dobson's allegations is the assertion that Defendants are jeopardizing a $150 million sale of UMZU. Doc. 31-1, supra, at ¶24, 26, 37. Dobson has referenced "negotiations" concerning a "potential $150 million-plus exit" as well as Defendants alleged cancellation of "a merger and acquisition process midstream" and that "TBF has lost a lot of value because of the unilateral cancellation of negotiations". *Id.* Mr. Dobson asserts "a low valuation and the sale itself will cause irreparable harm if TBF is sold without [Mr. Dobson's] input. Before Walker unilaterally cancelled negotiations with Lincoln Capital, I was

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

a key party to the negotiations and six months of due diligence that was performed." *Id.*

As set forth above, this is a fantasy of Mr. Dobson's. There is no $150 million valuation. Not a single party expressed any interest in purchasing UMZU during the time UMZU was consulting with Lincoln International. As such, there were no "negotiations" and there was no merger or acquisition to cancel. That said, it appears Mr. Dobson is conflicted on what his complaint with Defendants really is when it comes to a prospective sale of UMZU. Does he worry they canceled a sale and damaged him or does he believe they are going to enter into a sale and damage him? The two positions, as the Court correctly noted in its October 14, 2022 Order are at odds. *See* Doc. 10. Fortunately, the truth is, neither one happened or will happen.

## 4. Mr. Dobson is unlikely to succeed on the merits.

Plaintiff Dobson has petitioned this Court for injunctive relief for the second time and this second request does not address the deficiencies observed and communicated by the Court in response to the first. This Court explained the substantive and procedural shortcomings in Mr. Dobson's first request quite clearly and Mr. Dobson appears to have ignored them. The Court wrote:

Although Plaintiff frames his TRO as a prohibitory injunction, much of the relief Plaintiff seeks would more accurately be characterized as a mandatory injunction. Mandatory injunctions are disfavored, and "are not granted unless extreme or very serious damage will result[,] and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).

Plaintiff identifies the following irreparable harms: (1) TBF could be sold at a low valuation without Plaintiff's input, *see* Dobson Decl. ¶ 26 [Doc. # 3-2], (2) TBF's taxes may not be paid, *see id.* at ¶ 27, (3) the relationship between TBF and its largest manufacturer could be damaged, which could force TBF out of business, *id.* at ¶ 28, (4) Defendants could draw down TBF's line of credit, of which Plaintiff is a personal guarantor, *id.* at ¶ 29, and (5) he has "heard" that Defendants "may be entering a factoring deal, which would create many financial issues for TBF," *id.* at ¶ 30. Plaintiff offers no evidence that any of these harms is more than a mere possibility. There is no indication that a sale of the company is imminent (indeed, the only sale mentioned is a proposed sale that Plaintiff complains Defendants *cancelled* without consulting him), and only

16

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

speculation that the other harms might occur. *Cf. Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("Speculative injury does not constitute irreparable injury."). Indeed, although Plaintiff contends that Defendants seek to wrest control of TBF from him, he does not suggest that Defendants seek to loot or destroy the company. Moreover, although Plaintiff asserts a claim for declaratory relief, he has not explained why any potential injury would not be compensable through damages, and "[m]onetary injury is not normally considered irreparable." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (citations omitted).

The Court's view was correct in October and it remains correct today.

First, and before getting to the merits, Defendants note that to address the likelihood of success on the merits, one must examine a hypothetical universe. For the reasons set forth in Defendants' Joint Motion to Compel Arbitration, the merits of this case are properly addressed before the American Arbitration Association, where a matter initiated by Defendants against Mr. Dobson is already pending. Mr. Dobson has not filed any affirmative claims in connection with the AAA arbitration. Watkins Decl. 3 at ¶7. Thus, the question of whether Mr. Dobson is likely to succeed on the merits can only be answered by making the assumption that either (1) the Motion to Compel Arbitration is denied and Mr. Dobson's claims are adjudicated by this Court or (2) Mr. Dobson files his claims before the AAA and they are addressed there.

Second, putting process aside, Mr. Dobson is unlikely to prevail on the merits. The action brought by Mr. Dobson seeks a declaration that he is the 51% owner of TBF by virtue of his capital contributions and the terms of the TBF Operating Agreement and amendments thereto. Each of Dobson's three (3) claims for declaratory relief, breach of contract and breach of the implied covenant of good faith and fair dealing are dependent upon a favorable resolution of that core issue. If Mr. Dobson is not a majority owner of TBF, he cannot make a *prima facie* showing on any of his causes of action.

As such, the evidence and law on Mr. Dobson's ownership interests in TBF are central to the resolution of his likelihood of success on the merits. At this stage

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

of the litigation, the evidence is rather one-sided. The TBF Operating Agreement provides Plaintiff is to be the 51% member of TBF in exchange for unspecified sums of capital. *See* Ex. B to Dobson Dec. at p. 21.

The parties then corrected the oversight of not specifying the capital to be contributed by Plaintiff in the First Addendum to Operating Agreement for The Better Foundation, LLC. *See* Ex. C to Dobson Dec. That document provides Plaintiff is to provide $500,000 in one round of capital followed by a second infusion of $500,000. The specific terms of Mr. Dobson's required contributions were set forth as follows:

Conditions for Initial and Contingent Capital:

1.0 Initial Capital:

Michael Dobson ("Dobson") has agreed to provide five hundred thousand dollars ($500,000.00) in seed capital to enable Company to demonstrate "proof of concept" (i.e., that its business model is viable and capable of sustaining a profitable enterprise). For definition of "proof of concept," the business model is viable when we have two content partners that are earning more than we are spending on their growth, i.e. they are profitable. In addition, we have two content partner prospects that are requesting to become partners. As of the date of execution hereof, Dobson has invested approximately one hundred and fifty thousand ($150,000.00) or higher and will provide the remainder of the initial capital as may be reasonably required from time to time as determined by at least seventy-five (75%) percent of the Members.

2.0 Additional Capital:

2.1 Dobson will contribute to the company, not to exceed, five hundred thousand dollars in additional capital beyond the Initial Capital ($500,000.00). For so long and to the extent that the Company's operating cash flow is insufficient to fund the Company's capital needs, Dobson shall provide such portions of additional capital as may be reasonably required from time to time as determined by at least seventy-five (75%) percent of the Members.

2.2 If Company's operating cash flow is sufficient to sustain its operations on a long-term basis so as not to require the Additional five hundred thousand dollars ($500,000.00) Capital, or any portion therewith, there will be a bonus pool created for the four members (Thomas Ness, Darren Crawford, Christopher Walker and Nate Mohr). This bonus pool will be paid outside the normal salaries and expense reimbursements of the four members. The disbursement of this bonus pool (timing and dollar amounts) will require the same member voting per paragraph 2.1. The disbursement of this bonus pool shall not impact day-to-day operating cash flow.

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

2.3 Dobson may fulfill his Additional Capital obligations under Section 2.1 or 2.2 above by either (i) transferring such funds to the Company as required or (ii) selling a portion of his Membership Interest Units and providing the proceeds thereof to the Company. Any sale of Membership Interest Units shall be subject to a right of first refusal for other Members to purchase on equal terms prior to the consummation of any such sale of Membership Interest Units (which will not require any further approval by the Members). Upon consummation of such a sale, Dobson's and the Purchaser's Percentage Interest will be restated accordingly and attached hereto.

2.4 Dobson Capital will only be repaid at the time of the first significant Capital (or Re-Capitalization) Event after all the capital is deployed.

2.5 In the event Dobson fails to tender payment to the Company (whether by direct payment or stock sale) within thirty (30) days of such required contingent capital, his Percentage Interest shall be reduced on a pro-rata basis.

The Prost Report makes clear that Dobson never made the initial capital contribution of $500,000. After analyzing both the books and records of TBF and the tax returns, Mr. Prost reported:

Our first step was to analyze the capital accounts in the general ledger. We immediately realized the capital contributions recorded in the general ledgers (books and records) did not agree with the tax returns. Per the 2015 general ledger, there were a variety of sources of funding to the Mr. Dobson's capital account. The additional sources of funding to TBF included monies entered in the books as contributions from an entity named "The Whaler," Mike Dobson, unreimbursed expenses paid by Mike Dobson (charged to miscellaneous expense) and contributions from an individual named Jourdi De Ward. In addition, the tax workpapers for the 2015 tax return did not reflect the miscellaneous expense of $163,283.77 nor a contribution of a similar amount.

Per the TBF tax returns and as illustrated in my analysis of the TBF capital accounts, only one contribution has been received. This contribution of $32,506 is reflected on the 2015 Schedule K-1 for Mr. Dobson. As such, no other contributions have been received. In addition, Mr. Dobson's 2019 Schedule K-1 reflects a distribution of $36,000.

Not only has Mr. Dobson only ever contributed $32,506 of his own money to TBF, but he actually received a distribution of $36,000 in 2019. The evidence on the key issue of whether Mr. Dobson ever complied with the conditions precedent to becoming a majority member of TBF strongly favors Defendants on account of the detailed analysis and findings contained within the Prost Report.

Plaintiff has engaged a CPA to provide a declaration in this matter. However, curiously, that CPA has offered no opinion regarding the central issue of this

19

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

litigation. The CPA makes no reference to the Prost Report and makes no attempt to rebut its findings. The silence is deafening.

Instead, Plaintiff offers a declaration from Mr. Dobson, which provides the totality of the Plaintiff's evidence at this stage. It reads as follows:

> I am TBF's sole financier, having originally agreed to contribute up to $1 million in capital in exchange for my ownership stake. As of today, I have made total capital contributions of over $1.5 million. In contrast, Walker and Crawford have not invested a single dime of their own money in TBF/UMZU.

Doc. 31-1, supra, at ¶5. Plaintiff has been in possession of the Prost Report since August 1, 2022. Watkins Decl. 2 at ¶11. Plaintiff's counsel advised Defendants last week that Plaintiff's expert was evaluating the Prost Report and would prepare an analysis. Schwade Decl. at ¶5. Either that did not happen or it did happen and the findings were not favorable to Mr. Dobson. Defendants are confident any findings that were favorable would be presented by Plaintiff to this Court. Plaintiff's failure to provide any evidence on the core issue of the dispute while simultaneously seeking the extraordinary relief of a preliminary injunction is inexcusable and should not be countenanced by this Court. Regardless, as it stands, the Prost Report is substantively unrebutted and the evidence in the record overwhelmingly indicates Mr. Dobson has not made the capital contributions necessary to be the majority member of TBF and he is unlikely to prevail on his request for a declaratory judgment that he is the majority member of TBF.

Similarly, Plaintiff's causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing expressly hinge upon Plaintiff's status as the majority and/or managing member of TBF and his resultant ability to thwart any action that requires agreement of 75% of TBF's members.

Even if Plaintiff were to bring forth evidence sufficient to establish his status as a majority member of TBF, Plaintiff's second and third causes of action would be subject to the affirmative defense of prior breach. A party may unilaterally rescind a

contract if there is a material breach by the other party. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524 (9th Cir. 1993). A material breach is one that "is so dominant or pervasive as in any real or substantial measure to frustrate the purpose of the undertaking." *Id.* at 1530 (citing *Medico-Dental Bldg. Co. v. Horton & Converse*, 21 Cal. 2d 411 (1942)).

As more fully set forth above, set forth in the Prost Report and in Defendants' briefing on the Motion to Compel Arbitration, the Plaintiff herein has admitted, through counsel, to misappropriating $1,310,000 from TBF by drawing funds from a TBF line of credit and using same for personal expenses. *See* Watkins Decl. 2 at ¶8. This admission was set forth in Defendants' briefing on the Motion to Compel Arbitration and has gone unchallenged by the Plaintiff herein.

Plaintiff further breached his obligations to TBF and its members by encumbering TBF receivables for the purpose of obtaining funds from a factoring company and subsequently utilizing said funds for non-TBF purposes. Walker Decl. 2, supra. These actions, even if performed by the rightful majority or managing member of TBF, constitute a material breach of such a member or manager's contractual, common law and fiduciary obligations to TBF and its members sufficient to excuse further performance by TBF and its members of contractual obligations to Plaintiff.

For each of these reasons, Plaintiff is unlikely to prevail on the merits of his claims.

## 5. A Preliminary Injunction Against Defendants is Not in the Public Interest.

There is no public interest served in granting a mandatory injunction of the nature sought by Plaintiff herein. The *status quo* is best served by permitting Defendants to continue to operate UMZU, as they always have, unfettered by the interference of the person who has wronged both the Defendants and TBF. To re-

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

install Plaintiff at TBF with any authority to interfere in the management of UMZU or access TBF or UMZU funds would run counter to the public interest in ensuring honest and responsible corporate governance and respect for the rights of shareholders.

**6.  The Balance of Equities and Hardships Favors Defendants, Particularly When Viewed on a Sliding Scale Given the Strength of Defendant's Likelihood of Success on the Merits.**

In a tacit acknowledgement in the waning pages of the Motion that he lacks a position of strength on the merits of his claims, the Plaintiff shifts from position that he is likely to prevail on the merits and instead relies upon the weaker "sliding scale" approach to argue there are "serious questions" as to the merits of his claims and the hardships Plaintiff may suffer are so significant as to tip the balance of hardships in Plaintiff's favor.

First, Defendants concur that Plaintiff is unlikely to prevail on the merits.

Second, Defendants agree with the Court's October 14 observation that Plaintiff's harms, if any exist, are compensable through monetary damages. (citing "[m]onetary injury is not normally considered irreparable." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (citations omitted)). As such, there is no hardship to Plaintiff by denying the Motion. More to the point, to the extent Plaintiff asserts Defendants' failure to pay Plaintiff distributions of $25,000 per month constitute Plaintiff's harms, Defendants represent to the Court that those $25,000 distributions are being held in a segregated sub-account pending distribution upon the resolution of this dispute. Walker Decl. 2. In this case, if Defendant is given access to TBF funds and authority to direct UMZU's operations, the pattern of misconduct that gave rise to this dispute is likely to resume to the peril of Defendants and TBF.

### 7.  A Receiver Should Not be Appointed.

Plaintiff's assertion that a Receiver should be appointed is outrageous and further indicia of Plaintiff's poor business judgment and utter disregard for the well-being of the businesses and the businesses' assets. No receiver will operate TBF or UMZU more efficiently than the individuals who have been operating the companies since their inception. There is no evidence that Defendants are defrauding the companies or Plaintiff or otherwise squandering corporate assets. Defendants continue to be responsible operators and stewards of UMZU and its parent, TBF, and will continue to do so during the pendency of this litigation and the arbitration. TBF's current bank imposed significant loan covenants and reporting duties on TBF to address the disclosure by Defendants of the internal ownership issues arising from the surfacing of the accounting irregularities. That said, any additional safeguards and/or judicial oversight the Court deems appropriate to ensure same will be honored by Defendants.

### <u>CONCLUSION</u>

The Plaintiff has had ample opportunity to demonstrate both the merits of his claims against Defendants and the irreparable harm he will suffer in the absence of relief. Plaintiff has delayed in seeking relief from this Court and when finally electing to do so has brought little for the Court to consider. Plaintiff's claims are speculative and unsupported. Plaintiff and his expert have, apart from a single conclusory sentence, been silent on the core of the dispute. Plaintiff's harms, if any, are compensable through monetary relief, monetary relief, which, in part, is being dutifully held by Defendants pending a resolution of the dispute. Plaintiff's Motion should be denied and this matter should proceed to arbitration before the AAA.

///

///

///

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1

Dated:  December 22, 2022          **POLSINELLI LLP**


By: /s/ Noel S. Cohen
    Noel S. Cohen
    Attorneys for Defendants

DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

87396650.1