UNITED STATES DISTRICT COURT  
CENTRAL DISTRICT OF CALIFORNIA  
CIVIL MINUTES—GENERAL

JS-6

| | | | |
|---|---|---|---|
| Case No. | **CV 22-7372-DMG (PDx)** | Date | January 13, 2023 |
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 1 of 15 |

Present: The Honorable     **DOLLY M. GEE, UNITED STATES DISTRICT JUDGE**

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings:**    **IN CHAMBERS—ORDER RE DEFENDANTS' MOTION TO COMPEL ARBITRATION AND PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION [13] [31]**

       Before the Court is a Motion for a Preliminary Injunction ("MPI") filed by Plaintiff Michael Dobson. [Doc. # 31.] The MPI is fully briefed. [Doc. ## 37 ("MPI Opp."), 43 ("MPI Reply").] Also pending in this action is a fully-briefed Motion to Compel Arbitration ("MTC") filed by Defendants Darren Crawford and Christopher Walker. [Doc. ## 13 (MTC), 24 ("MTC Opp."), 28 ("MTC Reply").] The Court held a hearing on the motions on January 13, 2023. For the reasons stated herein, the Court **DENIES** Plaintiffs' MPI and **GRANTS** Defendants' MTC.

**I.  
FACTUAL AND PROCEDURAL BACKGROUND**

**A.     The Better Foundation Formation and Governing Documents**

       Dobson, Crawford, and Walker are the three members of The Better Foundation, LLC ("TBF"). Dobson Decl. ISO MPI ¶ 3 [Doc. # 31-1]. They founded TBF in 2015 with two other individuals, who are no longer members of the company. *Id*. at ¶ 6. TBF owns 100% of UMZU, LLC, a nutritional supplement company. *Id*. at ¶ 4. UMZU is TBF's only asset, and TBF is UMZU's only member. *Id*. at ¶ 4; *see also* Ex. A ("UMZU Operating Agreement") (identifying TBF as UMZU's only member and showing that TBF has 100% ownership of UMZU).

       TBF's Operating Agreement, dated April 1, 2015, provides that "all decisions concerning the management of the Company's business shall be made by the Vote of a Majority of the Members as defined above." Dobson Decl. ISO MPI, Ex. B ("TBF Operating Agreement") ¶ 5.1. The TBF Operating Agreement defines a "Majority of Members" as "a Member or Members whose Percentage Interests represent more than 50 percent of the Percentage Interests of all the Members." *Id.* at ¶ 1.18.

UNITED STATES DISTRICT COURT     JS-6
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 2 of 15 |

      The Agreement provides that Dobson has a 51% interest in TBF, and that Crawford and Walker each have a 12.25% interest. TBF Operating Agreement, Ex. A.[1] An undated addendum appoints Walker as TBF's President, Dobson as its Treasurer, and Crawford as its Secretary. Dobson Decl. ISO MPI, Ex. C. An undated "Written Resolution in Lieu of Initial Meeting" appoints Dobson as TBF's President, and authorizes him to open bank accounts on behalf of TBF. *Id.*, Ex. D. A Resolution dated May 11, 2015 appoints Dobson as the Manager of TBF, and authorizes him to open bank accounts on the company's behalf. *Id.*, Ex. E. TBF's tax returns list Dobson as the owner of 51% of its units. Dobson Decl. ISO MPI ¶ 21. In a March 17, 2021 email, Crawford described Dobson as owning 51% of TBF. *See* Suppl. Dobson Decl. ISO MPI, Ex. O [Doc. # 43-1].

      Crawford is the COO of UMZU. Crawford Decl. ISO MPI Opp. ¶ 2 [Doc. # 37-3]. Walker is the CEO of UMZU and claims that, as such, he has the authority to take executive actions without Dobson's approval. Walker Decl. ISO MPI Opp. ¶ 3 [Doc. # 37-4].[2] Dobson attests that the sole manager of UMZU is the MJD Trust, of which he is the settlor and trustee. Suppl. Dobson Decl. ISO MPI ¶ 3.

      The TBF Operating Agreement provides that "any controversy arising out of or relating to this Agreement or the breach thereof," except claims with a very low value, "shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ('AAA')." TBF Operating Agreement ¶ 10.2. The Agreement also requires that the parties attempt to mediate any dispute before initiating arbitration. *Id.* at ¶ 10.3.

---

[1] Two other members previously also owned 12.25% of TBF each. Those members are no longer associated with TBF, and both sides agree that Walker and Crawford each now own 24.5% of TBF.

[2] Dobson objects to these statements on the basis that they are unsupported by documentary evidence. On a motion for a preliminary injunction, inadmissible evidence may be considered, but "[i]t is up to the trial court to determine the weight to be given such evidence, taking into consideration the declarant's competency, personal knowledge, and credibility." *Welker v. Cicerone*, 174 F. Supp. 2d 1055, 1059 (C.D. Cal. 2001), *abrogated on other grounds by Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007) (citing *Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir.1985)). Dobson's objection is therefore **OVERRULED**, but the Court will weigh Crawford's and Walker's statements in accordance with the preponderance of the evidence in the record.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
|---|---|---|---|
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 3 of 15 |

**B.  Ownership Dispute**

  **1.  Background and Potential Sale**

Dobson describes himself as "an investor with a history of investing in start-up enterprises." Dobson Decl. ISO MPI ¶ 22. He says he is TBF's "sole financier, having originally agreed to contribute up to $1 million in capital in exchange for" his majority ownership of the company. *Id*. at ¶ 5. He asserts that he has made total capital contributions of over $1.5 million, while Walker and Crawford have not invested any of their own capital. *Id*. Nevertheless, in 2020, Crawford and Walker proposed that they and Dobson should each own one third of TBF. Dobson Decl. ISO MPI ¶ 16; *see also* Walker Decl. ISO MTC ¶ 19 [Doc. # 28-3]. Dobson refused. Dobson Decl. ISO MPI ¶ 16.

In August 2021, UMZU engaged an investment bank, Lincoln International, to explore UMZU's potential sale to a third party. Walker Decl. ISO MTC ¶ 9; Suppl. Dobson Decl. ISO MPI ¶ 7.e.[3] Walker attests that, beginning in late 2021 and on Lincoln's advice, UMZU began to pursue a strategy of prioritizing growth over profits to maximize its marketability. Walker Decl. ISO MTC ¶ 26. He says Dobson agreed with this strategy. *Id*. at ¶ 27. But in the spring of 2022, Lincoln informed Walker and Crawford that it had received no interest from prospective buyers. *Id*. at ¶ 28. Walker and Crawford decided to terminate Lincoln's services shortly thereafter, because (a) Lincoln had not identified an interested purchaser, (b) in the course of due diligence, Walker and Crawford had learned of alleged financial irregularities by Dobson, and (c) UMZU intended to revert to its prior strategy of maximizing profits, not growth. *Id*. at ¶¶ 29-31.

Dobson characterizes this transaction differently. He asserts that Walker canceled a potential $150 million sale of the company to Lincoln "after six months and $250,000 in due diligence was performed," without consulting Dobson. Dobson Decl. ISO MPI ¶¶ 24, 26. Dobson says the "unilateral" cancellation of negotiations caused TBF to lose "a lot of value." *Id*.

Dobson asserts that, in May 2022, Crawford and Walker again asked Dobson to give up his majority interest in TBF and make Dobson, Crawford, and Walker equal partners. Dobson Decl. ISO MPI ¶ 17. He attests that Crawford and Walker "bristled" at his refusal. *Id*. Walker denies that they made any such request in 2022. *See* Walker Decl. ISO MTC ¶ 23.

---

[3] Dobson refers to Lincoln International as "Lincoln Capital" elsewhere in the record, and Walker refers to the company as merely a "financial advisor." It appears, however, that all these references refer to the same entity, and the Court refers to the entity as Lincoln hereinafter for clarity.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
|---|---|---|---|
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 4 of 15 |

### 2. Dobson Locked Out of UMZU

The parties agree that, beginning in June 2022, Defendants sharply reduced Dobson's control over TBF and UMZU. *See* Walker Decl. ISO MPI ¶ 8. They suspended his company credit card, transferred all TBF funds out of bank accounts to which he has access, locked him out of TBF computer and email systems, and revoked his access to TBF financials. Dobson Decl. ISO MPI ¶¶ 24, 32-33; *see also* Walker Decl. ISO MPI ¶ 8. Dobson attests that they also told TBF staff to cease contact with him, forced Dobson's sister out of the company without his consent, hired Walker's wife without Dobson's consent, and caused TBF to cease paying Dobson's monthly $25,000 distribution. Dobson Decl. ISO MPI ¶ 24.[4] Walker confirms that TBF is withholding Dobson's distributions, but that they are being held in a segregated sub-account "pending resolution of this dispute." Walker Decl. ISO MPI ¶ 16.[5] Walker denies that Dobson's sister was "forced out," and instead says that Dobson himself negotiated her severance package after she voluntarily resigned. *Id*. at ¶ 17. Walker confirms that his own wife works for UMZU, but says she "performs bona fide services for UMZU and is paid a reasonable wage." *Id*. at ¶ 17.

Defendants assert they took these actions "upon learning of some of the early findings of" Michael Prost, a forensic account who prepared a July 12, 2022 Report on behalf of TBF. Prost Report [Doc. # 37-5]. The Prost Report states that Prost was originally engaged to perform tax due diligence in preparation for the potential sale of TBF, but that after he discovered that the capital contributions recorded in TBF's ledgers did not agree with TBF's tax returns, Prost began to investigate the relationship between Dobson, TBF, and an affiliated company called Kinobody. *Id*. at 2, 6. Prost's analysis initially raised questions regarding why Dobson had allocated approximately $1,055,000 withdrawn from Kinobody (in which TBF had a 50% ownership stake) via TBF as a distribution to Dobson (who had no personal ownership stake in Kinobody). *Id*. at 7. Ultimately, Prost concluded that Dobson had taken between $3,432,723.84 and $4,874,679.04 more capital out of TBF than he had contributed. *Id*. at 10.

Prost's analysis emphasizes that it is provisional, and frames its findings in terms of raising questions rather than providing answers. Still, the Report notes that Prost discussed his concerns with Walker and Crawford during the course of his investigation. On July 27, 2022, Defendants' counsel sent Dobson "a detailed letter . . . asserting misconduct by Dobson."

---

[4] An accounting submitted in support of the MPI shows that Dobson received distributions from January through June of 2022, and another distribution in September 2022. Engel Decl., Sched. E [Doc. # 31-2].

[5] Counsel for Defendants attests that he informed Dobson's counsel of this plan on December 14, 2022. Schwade Decl. ¶ 4 [Doc. # 37-1].

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
|---|---|---|---|
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 5 of 15 |

Watkins Decl. ISO MPI ¶ 5 [Doc. # 37-2]. Counsel provided a copy of the Report to Dobson on August 1, 2022. Watkins Decl. ISO MTC ¶ 11.

### 3. Mediation and Arbitration Claim

Pursuant to the TBF Operating Agreement, the parties participated in a mediation relating to Defendants' allegations against Dobson on September 9, 2022, but did not resolve their dispute. Watkins Decl. ISO MTC ¶ 8 [Doc. # 13-3]. On September 26, 2022, Defendants initiated an arbitration in Colorado. Watkins Decl. ISO MTC ¶ 10; *see also* Dobson Decl. ISO MPI ¶ 20. Defendants assert in their Statement of Claim that Dobson did not actually make his promised capital contributions to TBF, and has in fact engaged in a scheme to take distributions from TBF to which he was not entitled. *See* Watkins Decl. ISO MTC, Ex. A ("Statement of Claim") ¶¶ 20-22, 28. Defendants also assert that Dobson entered into a "factoring" transaction that resulted in a $99,490.29 judgment against TBF in 2020, of which Dobson was aware, and which Dobson satisfied in August 2022, but which he never disclosed to Defendants. *Id.* at ¶¶ 42-44. Defendants assert claims for fraud in the inducement, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, conversion, money had and received, unjust enrichment, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, civil conspiracy, accounting, and declaratory judgment. Dobson's counsel entered an appearance in the arbitration on October 11, 2022,[6] but has not filed any affirmative claims in the arbitration. Watkins Decl. ISO MPI ¶ 7; Watkins Decl. ISO MTC ¶ 19.

### 4. Effects on Dobson

A Statement of Information filed with the California Secretary of State on October 1, 2022 lists Dobson's name as a Manager or Member, but his name and address have been struck through. Dobson Decl. ISO MPI, Ex. G. Crawford attests that this form is completed online via the Secretary of State's website, and that in attempting to add himself as a member of TBF as a matter of record, he inadvertently deleted Dobson's name. Crawford Decl. ISO MTC ¶¶ 4-6. When counsel alerted him to the error, he corrected the form. *Id.* at ¶ 7. Another Statement of Information was filed with the Secretary of State on October 21, 2022, that lists Dobson's name without the strikethrough. Dobson Decl. ISO MPI, Ex. H. Crawford says the reason he sought to update the form was because he learned that Dobson had permitted default judgment to be entered against TBF while Dobson was TBF's registered agent for service. Crawford Decl. ISO MTC ¶ 8.

---

[6] Dobson filed the instant action, and an *ex parte* application for a Temporary Restraining Order, the same day. *See* Compl. [Doc. # 1].

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| | | | |
|---|---|---|---|
| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 6 of 15 |

      UMZU's primary manufacturer is a company called Lief. Dobson Decl. ISO MPI ¶ 14. Dobson attests that he is one of the personal guarantors on the Lief line of credit. Dobson Decl. ISO MPI ¶ 14. UMZU currently owes Lief approximately $2 million on a line of credit that Dobson personally guarantees. Dobson Decl. ISO MPI ¶ 28.[7] Although Dobson attests that "vendors have been contacting Dobson [sic] about not being paid and threatening to take action against UMZU/TBF," he does not assert that Lief has contacted him about not being paid. *Id.*[8] Dobson does assert that a law firm called Massumi and Consoli LLP contacted him on October 10, 2022, regarding an outstanding balance of $30,186.25 for services relating to due diligence performed in preparation for a potential sale. *Id.*; *see also id*., Ex. F (email from Massumi and Consoli accounting department). But Walker says Massumi and Consoli's bill remains outstanding because the firm has not provided UMZU with adequate statements regarding their hours bill. Walker Decl. ISO MTC Reply ¶ 16. Dobson states that "other vendors have been contacting [him] asking why bills have not been paid," but does not identify the vendors. Dobson Decl. ISO MPI ¶ 28.

      Dobson says that, because he has been "locked out," he has been unable to fulfill his duties as manager of TBF, including keeping TBF's books. Dobson Decl. ISO MPI ¶ 25. Specifically, he is responsible for payment of TBF's taxes in 42 U.S. states and territories, and he attests that without access to TBF's financials, he is unable to confirm that this has occurred. *Id*. at ¶ 27. But Walker attests that Defendants timely paid those taxes, and that Defendants informed Dobson of that in October 2022. Walker Decl. ISO MPI ¶ 25.

      Dobson claims that he "has no idea what is going on with" a $6 million line of credit for TBF that he personally guarantees. Dobson Decl. ISO MPI ¶ 29. He says Defendants "could draw down [the credit] at any time, including to pay their personal income taxes." *Id*. He also attests that he "ha[s] heard that [Defendants] may be entering a factoring deal, which would create many financial issues for TBF." *Id*. at ¶ 30. He says that, before he was locked out, he "noticed TBF did not have much cash on hand," and he "now fear[s] Defendants are pulling money out of TBF to pay for their own income taxes, legal fees, and other improper purposes." *Id*. at ¶ 34. Walker denies that he or Crawford is using TBF funds to pay their income taxes or other personal expenses. Walker Decl. ISO MPI ¶ 24.

---

      [7] Defendants note that, earlier in his declaration, Dobson states that "the current balance" on the Lief line of credit "is approximately $7-8 million." Dobson Decl. ISO MPI ¶ 14. Because Defendants assert that TBF or UMZU owes Lief approximately $2 million, and Dobson apparently agrees, *see id.* at ¶ 28, the Court does not credit Dobson's contradictory statement that the balance is $7-8 million.

      [8] According to Walker, UMZU "is current with Lief," and is "on track to owe less than $1,000,000 by the beginning of 2023." Walker Decl. ISO MTC Reply ¶ 17 [Doc. # 28-3].

UNITED STATES DISTRICT COURT JS-6
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 7 of 15 |

### 5. Effects on UMZU and TBF

Jason A. Engel, a CPA with experience in forensic accounting, filed a declaration in support of the MPI in which he describes the results of an investigation into the financial performance of UMZU during the first eight months of 2022. Engel Decl. ¶ 8 [Doc. # 31-2]. The investigation is based on internal financial statements Defendants produced through August 31, 2022, but Engel notes that Defendants have not given Dobson access to ledgers that might provide additional information. *Id*. at ¶ 26.

Engel bases his analysis on the understanding that Dobson was locked out around March 2022. Engel Decl. ¶ 8.[9] From 2018 to 2021, UMZU's sales grew from $6.6 million in 2018 to $71.3 million in 2021. Engel Decl. ¶ 10. Sales grew at an annual rate of between 79% and 195%. *Id*. From April to August 2021, revenues were approximately $33.8 million. *Id.* at ¶ 11. But during the same period in 2022, revenues were approximately $27.2 million, reflecting a decline of about $6.6 million from the same period in the previous year. *Id.* at ¶ 11. By contrast, revenues for the first three months of 2022 were approximately $16.3 million, compared to $16 million in the first three months of 2021. *Id*. at ¶ 12. In 2021, the company had profits of approximately $5.7 million, but the company actually showed a loss of $56,000 for the first eight months of 2022. *Id*. at ¶ 13. Engel concludes that the profitability of UMZU "materially declined in 2022." *Id*. From April to August 2022, UMZU had zero growth in sales for the first time since its inception. *Id.* at ¶ 15.a. The underlying analysis shows a sharp drop in revenue for April, May, and June 2022 compared to the same months in 2021, but a more limited decline for March, July, and August 2022 as compared to those months in 2021. Engel Decl., Sched. B.

Moreover, Engel finds that operating expenses materially increased from 2021 to 2022. In 2021, operating expenses approximated 77% of sales. But in 2022, they were 83% of sales. Engel Decl. ¶ 14. During the first eight months of 2022, Defendants paid themselves guaranteed payments of $442,857. They also made $375,000 in distributions, of which $150,000 was paid to Dobson. *Id*. at ¶ 17. Engels states that, pursuant to his understanding that each of the parties had historically been paid $25,000 per month, Defendants had overpaid themselves by $267,857 for the first eight months of 2022. *Id*. at ¶ 20. He also finds that Defendants had caused UMZU to pay approximately $153,000 for their legal fees in connection with their dispute with Dobson, while refusing to reimburse Dobson for his legal fees. *Id*. at ¶¶ 24-25. Walker denies that TBF or UMZU is paying Defendants' legal fees, although he says the parties agreed that UMZU would cover the costs of mediation, and says UMZU has paid a portion of Prost's fees, including for his appearance at the mediation. Walker Decl. ISO MPI ¶¶ 19-20. Engel states that, in his

---

[9] In his Reply, Dobson appears to agree with Defendants that the "lockout" actually occurred in June 2022. *See, e.g.*, Reply at 9.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
|---|---|---|---|
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 8 of 15 |

opinion, "there is considerable risk" that Defendants have made additional distributions for salaries to family members of Defendants, payments to related entities associated with Defendants, and personal expenses. Engel Decl. ¶ 28.

**C.     District Court Action**

Dobson filed the instant action against Crawford and Walker on October 11, 2022, the same day he entered an appearance in the arbitration against him. [Doc. # 1.] That same day, Dobson applied *ex parte* for a Temporary Restraining Order ("TRO"), in which he asked the Court to (1) reinstate him as Chairman, President, Manager, and Treasurer of TBF, (2) restrain Defendants from making changes at TBF, (3) enjoin the arbitration, and (4) permit expedited discovery. TRO App. [Doc. # 3]. On October 14, 2022, the Court denied the TRO, on the grounds that Dobson had failed to identify "concrete, imminent, extreme or very serious harm" that would result from the Court's denial of a TRO, as is required to obtain a TRO without providing notice to the other party. [Doc. # 10.] The Court denied the TRO, however, without prejudice to refiling as a properly-noticed MPI.

On November 18, 2022, Defendants moved to compel arbitration of the instant dispute. In his Opposition, Dobson concedes that the parties are obligated to arbitrate certain disputes, but argues that he is entitled to injunctive relief pending resolution of the arbitration. On December 16, 2022, Dobson filed the instant MPI. Pursuant to the MPI, Dobson seeks to enjoin Defendants from:

1. Appointing any new managers, directors, or officers of TBF or UMZU;
2. Taking any steps to disrupt or frustrate TBF's operations;
3. Terminating, amending, assigning, or otherwise altering any contractual obligations with any of TBF's vendors, suppliers, manufacturers, lenders, landlords, tenants, customers, distributors, or other operational partners or affiliates;
4. Withholding Dobson's monthly distributions;
5. Amending, terminating, selling, encumbering, or otherwise altering the current ownership shares or interests of TBF;
6. Amending or altering TBF's operational controls;
7. Amending, assigning, invalidating, or otherwise changing in any manner any of TBF's organizational and governing documents;
8. Incurring new or increased debts or liabilities on behalf of, or related to, TBF;
9. Entering into negotiations with any third parties regarding selling or encumbering any portion of TBF;
10. Agreeing to accept any new investments;

| | | |
|---|---|---|
| UNITED STATES DISTRICT COURT<br>CENTRAL DISTRICT OF CALIFORNIA<br>CIVIL MINUTES—GENERAL | | JS-6 |
| Case No.  CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
| Title  *Michael Dobson v. Darren Crawford, et al.* | Page | 9 of 15 |

11. Diluting Plaintiff's membership percentage;
12. Transferring any funds from any of TBF's approved accounts;
13. Entering into any new agreements or contracts on behalf of, or related to, TBF;
14. Breaching or rescinding any current agreements or contracts to which TBF is a party;
15. Hiring or firing of any salaried employees of TBF;
16. Filing any new documents on behalf of TBF with the California Secretary of State;
17. Preventing Plaintiff from fulfilling his responsibilities as Chairman, President, Manager, and Treasurer of TBF;
18. Hindering, or otherwise preventing Plaintiff from accessing TBF's books, records, computer systems, bank accounts, financial information, customer lists and any other records or systems to which he previously had access as Chairman, Manager, and/or Treasurer;
19. Preventing Plaintiff from resuming his duties as the Chairman, Manager, President, and Treasurer of TBF, or in the alternative, appointing a neutral manager to conduct operations during the pendency of the dispute; and
20. Such other restrictions as the Court deems proper.

Proposed Order ISO MPI [Doc. # 31-3].

### III.
### DISCUSSION

The parties generally agree that the underlying dispute regarding Dobson's contributions to TBF should be resolved through arbitration. Indeed, Dobson appears to concede that the claims he asserts in his Complaint should properly be resolved by the arbitrator. *See, e.g.*, MTC Opp. at 7 (noting that Dobson intends to participate in the arbitration but seeks interim injunctive relief pending resolution). It appears to the Court that Dobson's breach of contract and breach of the implied covenant of good faith and fair dealing claims constitute a "controversy arising out of or relating to [the TBF Operating] Agreement or the breach thereof." TBF Operating Agreement ¶ 10.2. The dispute is therefore subject to arbitration.[10] Still, Dobson argues that he is entitled to injunctive relief pending resolution of the ongoing arbitration. Thus, the real

---

[10] Dobson also asks the Court to deny the MTC for lack of compliance with Local Rule 7-3. He asserts that Defendants' counsel met and conferred regarding a motion to *dismiss* this action in light of the pending arbitration, rather than a motion to compel arbitration. *See* MTC Opp. at 7 n.1, 12. In reply, Defendants' counsel attests that he did inform Dobson's counsel of Defendants' intention to move to compel arbitration, and discussed the substance of such a motion. *See* Cohen Decl. ISO MTC Reply ¶ 5 [Doc. # 28-2]. Defendants' counsel complied either substantially or fully with Rule 7-3, and the Court declines to deny the motion based on Rule 7-3 non-compliance.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
|---|---|---|---|
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 10 of 15 |

question before the Court is not whether to compel arbitration, but whether injunctive relief should be granted while arbitration is ongoing.

### A. Availability of Interim Relief Pending Arbitration

District courts in the Ninth Circuit have the authority to issue interim injunctive relief, even on arbitrable claims, to preserve the status quo "and the meaningfulness of the arbitration process." *Toyo Tire Holdings Of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010). Still, this rule does not mean that district courts must consider a request for injunctive relief on arbitrable claims. Instead, a party seeking interim relief on an arbitrable claim may obtain that relief "only if 'necessary to preserve the status quo' until the case [can] be heard by an arbitrator." *Capriole v. Uber Techs.*, Inc., 7 F.4th 854, 868 (9th Cir. 2021) (quoting *Toyo*, 609 F.3d at 981).

Dobson complains that the arbitration is moving too slowly to afford him the relief that he seeks. But there is no indication that, despite his apparent agreement that his claims are subject to arbitration, he has sought any relief at all in the arbitration. Indeed, he does not dispute that he has not yet filed a claim in arbitration. Although he is correct that the AAA's rules, and Ninth Circuit authority, permit him to seek "interim measures" before this Court, his actions here strongly suggest that he seeks not interim relief in aid of arbitration, but an alternative forum for mandatory injunctive relief. For example, in his *ex parte* application for a TRO, he sought to enjoin the arbitration, and leave to conduct expedited discovery in this action. *See* TRO App. at 3. He no longer explicitly seeks that relief here, although he does suggest that the Court stay the arbitration pending resolution of this motion "if Defendants are concerned that Dobson's request [for injunctive relief] interferes with the arbitration." MTC Opp. at 7. This is significantly different from the facts of *Toyo*, in which the plaintiff seeking to enjoin the defendants from dissolving a years-old business relationship was *also* the party who sought to invoke the arbitration clause. *See* 609 F.3d at 978 (the plaintiff requested arbitration and sought interim injunctive relief through the arbitration proceeding, and filed a complaint in the district court on the same day). Dobson's newfound insistence that this action is intended to provide interim relief in aid of an arbitration he previously sought to enjoin is not well taken.

Still, even if the Court credits Dobson's assertion that he seeks only interim relief, the Ninth Circuit's previous decisions indicate that whether injunctive relief is available in cases such as this one will depend on whether an injunction will help "'preserve the meaningfulness of the arbitral process.'" *Capriole*, 7 F.4th at 868 (quoting *Toyo*, 609 F.3d at 980). The question, then, is whether providing the injunctive relief Dobson seeks will preserve the status quo pending a more fulsome resolution of this case through arbitration.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| | | | |
|---|---|---|---|
| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 11 of 15 |

The Court concludes that Dobson has not demonstrated that the meaningfulness of the arbitral process will be undermined absent an injunction. For the same reasons, the Court concludes that Dobson has not demonstrated that he is likely to suffer irreparable harm in the absence of a preliminary injunction. *See Toyo*, 609 F.3d at 982 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)) (a plaintiff seeking preliminary injunctive relief must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest).[11] Those reasons are discussed below.

**B.      Irreparable Harm**

As this Court noted in denying Dobson's TRO, "[m]onetary injury is not normally considered irreparable." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)). But a party whose claim would otherwise be compensable through damages may still be entitled to injunctive relief if he can show a likelihood of dissipation of the assets at issue, or some other reason why he would be unable to recover monetary damages in the absence of an injunction. *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).

Dobson contends that, based on Engel's declaration regarding harm to TBF since his departure, as well as his own concerns regarding possible misbehavior by Walker and Crawford during that time, he is likely to suffer irreparable harm in the absence of an injunction because TBF's assets or goodwill are likely to be squandered before arbitration is concluded.

First, the Court notes that the proposed injunction would not maintain the status quo, or even restore the status quo from the time he filed the instant action, but would restore Dobson to the position he held in June 2022—five months before this action was filed. As the Court stated in its order denying Dobson's TRO, mandatory injunctions are disfavored. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). This procedural posture weighs against an injunction.

---

[11] Under the Ninth Circuit's "sliding scale" approach, the four "elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). An injunction is therefore also appropriate when a plaintiff raises "serious questions going to the merits," demonstrates that "the balance of hardships tips sharply in [their] favor," and "shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). Irreparable harm is an element under either approach.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| | | | |
|---|---|---|---|
| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 12 of 15 |

In addition, Dobson argues that, since Defendants locked him out of TBF, they have been making concerted efforts to destroy TBF, with the intent of starting a new brand. He offers Engel's declaration in support of this contention. But Engel's conclusions do not support Dobson's argument. Engel's analysis shows a drop in TBF's revenue for the first eight months of 2022 as compared to the same months in 2021, but the drop (of approximately 20%) is not so steep as to indicate that Defendants are intentionally driving TBF into the ground. Instead, those results are consistent with Walker's assertion (uncontested by Dobson) that Dobson, Walker, and Crawford made a collective decision to emphasize growth over profits from approximately August 2021 to March 2022. This assertion also explains the drop in profits from 2021 to 2022, and perhaps the 6% increase in operating expenses. Engel's analysis also relies on the assumption that Dobson was locked out beginning in March 2022, but the parties now agree that the lock-out actually occurred around June 2022. Because Engel's analysis is based on an incorrect assumption, the Court places less value on his conclusions.

Engel's report also find that Defendants took distributions of $267,857 more than would be expected during the first eight months of 2022, and that UMZU has paid considerably more in legal fees in 2022 than in 2021. *See* Engel Decl. ¶ 20. Although TBF and UMZU (and, by extension, Dobson) are likely entitled to an explanation of these distributions and payments, they alone do not demonstrate the Defendants are likely to dissipate TBF's assets before arbitration can be concluded. In *Johnson*, the Ninth Circuit held that the plaintiffs had shown a likelihood of irreparable harm where they established they were likely to succeed in proving that the defendant had "impermissibly awarded himself tens of millions of dollars in compensation . . . in contravention of the highest fiduciary duties known to the law." 572 F.3d at 1085. The Court reasoned that such a person "is presumably more than capable of placing assets in his personal possession beyond the reach of a judgment," and therefore that an asset freeze was justified to prevent dissipation of those assets before the plaintiffs could recover them. *Id*. Unlike in *Johnson*, there is no evidence here that Walker and Crawford have a history of hiding or mismanaging TBF's assets. Indeed, there is no such allegation here. Defendants claim to have set aside payments potentially owed to Dobson pending resolution of the arbitration proceedings. Dobson claims only that Walker and Crawford illegally locked him out of UMZU and TBF, not that they committed fraud in the management of those companies. Nor is this case like *Prizant v. Abbott*, also cited by Dobson, in which the district court imposed a constructive trust after the plaintiffs persuasively demonstrated that the defendants had perpetuated a years-long fraud and there was evidence that the defendants were already in financial hardship. *See Prizant v. Abbott*, No. 3:20-CV-01604-H-LL, 2020 WL 6204629, at *6 (S.D. Cal. Sept. 9, 2020). Absent any

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
|---|---|---|---|
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 13 of 15 |

evidence of prior fraudulent conduct, the Court does not find that Dobson has shown Defendants are likely to seek to dissipate TBF's assets.[12]

Dobson's only evidence that Defendants have "intensif[ied] their illegal efforts to . . . destroy TBF" since this Court denied his request for a TRO is Defendants' submission of a "false" statement to the California Secretary of State in which they removed Dobson from the list of TBF's members. *See* MTC Opp. at 6. But Walker has persuasively explained that this was an error, and the parties agree that it was promptly corrected. The Court does not find that Defendants have made any new efforts to destroy TBF. The other harms Dobson raises are mere retreads of the arguments he made in support of his TRO, and are too speculative to support issuance of a preliminary injunction. *See* Order re TRO at 2.

Finally, Dobson's delay in filing his Complaint and MPI "implies a lack of urgency and irreparable harm." *Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 897 (N.D. Cal. 2019) (quoting *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)); *see also Oakland Trib.*, 782 F.2d at 1377 (affirming denial of preliminary injunction challenging longstanding practice where "no *new* harm is imminent") (emphasis added). The timing of Dobson's filing—apparently in response to Defendants' arbitration claim, rather than in response to Defendants' actions in locking Dobson out—also implies a lack of urgency and irreparable harm.

The Court therefore finds that Dobson has not established a likelihood of irreparable injury absent an injunction. Because Dobson has not met this element, the Court **DENIES** Dobson's MPI.[13]

**C.      Appointment of a Receiver**

In the alternative, Dobson seeks appointment of a receiver to manage TBF while arbitration is pending. Appointment of a receiver "is an extraordinary equitable remedy." *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009). Federal courts consider a number of factors in determining whether to appoint a receiver, including:

---

[12] Dobson also attests that "TBF has already lost a lot of value because of" Walker's alleged "unilateral cancellation of negotiations" with Lincoln. Dobson Decl. ISO MPI ¶ 26. But even if that is true, a preliminary injunction here cannot undo that loss of value. There is no evidence in the record of an imminent threat that Defendants will sell the company for a low price without consulting Dobson.

[13] This finding also supports the denial of interim relief because Dobson has not shown that an injunction is necessary to preserve the meaningfulness of arbitration.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
|---|---|---|---|
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 14 of 15 |

> (1) whether the party seeking the appointment has a valid claim; (2) whether there is fraudulent conduct or the probability of fraudulent conduct, by the defendant; (3) whether the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property; and, (7) whether the plaintiff's interests sought to be protected will in fact be well-served by receivership.

*Id*. The Court has already concluded that there is no evidence of fraudulent conduct by Defendants, nor is there evidence that TBF is in imminent danger of being diminished in value or its assets squandered. The Court has also concluded that Dobson has not shown that legal remedies would be inadequate, nor that Dobson will suffer irreparable harm without an injunction. Moreover, based upon the Court's own experience, the cost of a receiver could exceed the amounts currently in dispute between the parties.

If Engel's declaration regarding UMZU's profits and revenues indicates anything, it is more likely mismanagement than fraud. In such a situation, appointment of a receiver would have as many attendant risks as benefits: there is no guarantee that an outside individual, unfamiliar with the company, would have greater success than its current managers are having. Moreover, the Court is not even persuaded that UMZU is being mismanaged—a short-term, temporary decline in revenue and profits could be consistent with changes to long-term corporate strategy, as Walker says it is. Because Dobson has not established that Defendants are likely to squander TBF's assets, the Court does not find that appointment of a receiver is appropriate in this case. The Court therefore denies Dobson's request for appointment of a receiver.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

JS-6

| Case No. | CV 22-7372-DMG (PDx) | Date | January 13, 2023 |
|---|---|---|---|
| Title | *Michael Dobson v. Darren Crawford, et al.* | Page | 15 of 15 |

## IV.
## CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendants' MTC and **DENIES** Dobson's MPI. This action is **STAYED** and placed on inactive status pending the completion of arbitration proceedings. The parties shall notify the Court within **ten (10) days** after the conclusion of arbitration or receipt of an arbitral ruling, whichever is later, and inform the Court whether there is any reason why this case should be reopened.

**IT IS SO ORDERED.**